1

2

3

4

5

6

7

8 IN THE UNITED STATES DISTRICT COURT

9 FOR THE EASTERN DISTRICT OF CALIFORNIA

10 CEDRIC WOODS,

11           Plaintiff,                  No. CIV S-03-1976 GEB EFB P

12     vs.

13 D. L. RUNNELS, et al.,

14           Defendants.           <u>FINDINGS AND RECOMMENDATIONS</u>

15 _____/

16      Plaintiff is a prisoner, without counsel, suing for alleged civil rights violations. *See* 42

17 U.S.C. § 1983. This action proceeds on the May 13, 2004, verified first amended complaint in

18 which plaintiff claims that Correctional Officer P. Zills and Correctional Sergeant M. Jimenez

19 violated his Eighth Amendment rights. Plaintiff alleges that Officers Zills and Jimenez knew

20 that white prisoners planned to attack black prisoners, and failed to take reasonable measures to

21 prevent it, resulting in plaintiff being beaten and injured. At issue is whether a delay of a few

22 minutes in ordering "down" all prisoners in the yard amounts to deliberate indifference to

23 plaintiff's safety in violation of his Eighth Amendment right against cruel and unusual

24 punishment. Plaintiff asserts that the only reasonable measure under the circumstances present

25 here was to immediately "call the yard down," a security measure explained below. Defendants

26 move for summary judgment on the ground that there is no genuine issue about whether they

1   violated plaintiff's Eighth Amendment rights and they are entitled to qualified immunity.  For

2   the reasons explained below, the court finds that the evidence here cannot support a finding that

3   the officers were deliberately indifferent to the plaintiff's safety.  To the contrary, they took

4   immediate action to notify other officers and examine the yard for signs of imminent violence.

5   At the very moment that Officer Jimenez reached for his radio to order the yard down, the

6   inmates watching him began their attack.

7   **I.      Facts**

8           It is undisputed that "calling the yard down" is a serious security measure.  Neither party

9   defines the term and the court has not found it in the relevant regulatory code.  However, the

10  court construes it to mean an order that each and every prisoner immediately stop what he is

11  doing and get down on the ground.  An officer may call the yard down based on the possibility

12  of violence, but the prisoners might then be subjected to an unclothed body and cavity search,

13  which requires the assistance of additional custody and medical staff.  Declaration of Jimenez

14  ("Jimenez Decl."), at ¶ 6.  Such an order disrupts the prisoners' recreational time, which

15  prisoners value highly.  *Id.*, at ¶ 4.  Extraordinary searches and the deprivation of recreational

16  time tends to create anxiety, frustration and anger among the prisoners.  *Id.*, at ¶ 7.  Therefore, a

17  single prisoner's statement that a riot is imminent ordinarily is not sufficient to call the yard

18  down.  *Id.*, at ¶ 8.

19          The incident giving rise to this action occurred on June 17, 2003, at High Desert State

20  Prison ("HDSP"), where plaintiff was confined and where defendants were employed.

21  Defendant Jimenez was a correctional sergeant and Zills was a correctional officer.  On the day

22  in question, defendant Jimenez was responsible for daily program operations in the upper yard of

23  C Facility.  *Id.*, at ¶ 2.  Defendant Zills was assigned as a floor officer in Building 5 of C Facility,

24  and reported to Jimenez.  *Id.*  Nevertheless, at around 9:30 that morning, Zills, for reasons not

25  apparent to the court, was in Building 6 of C Facility when a white prisoner approached him,

26  gave him a prisoner-made weapon and asked for permission to leave the yard because white and

1  black prisoners were going to attack each other.   Declaration of Zills, ¶ 3; Exhibit to Complaint,

2  unnumbered page 1.  Zills ordered the prisoner to put down the weapon and to step back.  *Id*., at

3  ¶ 4.  Zills immediately reported this incident to Jimenez.  *Id*., at ¶ 6.

4  When he received this information, Jimenez spoke to the prisoner who had reported the

5  possibility of an attack.  *Id*., at ¶ 7.  Thereafter, Jimenez took a few minutes to observe the

6  several hundred prisoners on the yard and saw prisoners playing handball and basketball,

7  running on the track and playing cards or other games.  *Id*., at ¶¶ 4, 9.   He noticed that 15 to 20

8  prisoners on the volleyball court near Building 6 were wearing state-issued blue pants and shirts.

9  *Id*., at

10  ¶ 10.  He thought their dress was unusual since it was June.  *Id.*  Most other prisoners were

11  wearing shorts.  *Id*., at ¶ 11.

12  At 9:33 a.m. Officer Jimenez radioed Sergeants Harnden and Gamberg and directed them

13  to report to Building 6.  Jimenez Decl., at ¶ 12.  When they arrived, Jimenez told them about the

14  white prisoner and his report, and asked whether they thought he should call down the yard.  *Id*.,

15  at ¶ 13.  The three surveyed the yard specifically looking for unusual activity, and noticed that

16  the 15 to 20 prisoner wearing pants were looking intently at them.  *Id*.  The prisoners seemed

17  nervous.  *Id*.  The three concluded, based on the prisoners in pants who were looking at them,

18  that they should call down the yard and search for weapons.  *Id*., at ¶ 15.  As Jimenez reached for

19  his radio, the 15-20 overdressed white prisoners on the volleyball court who were watching him

20  ran toward the area where black prisoners were congregated, and attacked them with their fists.

21  Jimenez Decl., at ¶ 16;  Zills Decl., at ¶ 10; Exhibit to Complaint at unnumbered page 1.  Other

22  prisoners began fighting in the grass near the west corner of the basketball court.  Zills Decl., at

23  ¶ 9.  Jimenez and other officers ordered the prisoners to get down.  Jimenez Decl., at ¶ 17; Zills

24  Decl., at ¶ 8.  Uninvolved prisoners obeyed the order, but those fighting continued to hit, kick

25  and stab not only each other, but also prisoners who were down.  Exhibit to Verified Complaint,

26  unnumbered pages 1-4.  Officers had to fire several rounds to quell the disturbance.  Jimenez

1 Decl., at ¶ 19.

2      During the riot, plaintiff was attacked by white prisoners.  Compl. at unnumbered pages

3 1-2.  He alleges that several white prisoners "beat, kicked, and struck [him] with closed fist[s]

4 repeatedly."  Compl. at unnumbered page 2.  He alleges that as a result he suffers headaches, and

5 difficulty in breathing and in seeing out of his left eye.  *Id.*  Defendants submit a medical report

6 with the notation that "custody staff" escorted plaintiff to the infirmary, plaintiff denied having

7 any injuries as a result of the riot, and medical staff found no injuries on plaintiff.  Exhibit 1 to

8 Defendants' Statement of Undisputed Facts ("Defs.' SUF").  However, plaintiff alleges that the

9 medical record upon which defendants rely was made during the triage after the riot, during

10 which medical staff were looking for and treating only stab wounds, which plaintiff did not have.

11 Pl.'s V. Opp'n to Defs.' Mot., at 3-4.

12 **II.    Summary Judgment Standards**

13      Summary judgment is appropriate when there is no genuine issue of material fact and the

14 movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v.*

15 *Catrett*, 477 U.S. 317, 322 (1986).[1]  The standards under Rule 56 determine whether there is a

16 "genuine issue of material fact" are well established:

17           [T]he Supreme Court, by clarifying what the non-moving party
            must do to withstand a motion for summary judgment, has
18           increased the utility of summary judgment.  First, the Court has
            made clear that if the nonmoving party will bear the burden of
19           proof at trial as to an element essential to its case, and that party
            fails to make a showing sufficient to establish a genuine dispute of
20           fact with respect to the existence of that element, then summary
            judgment is appropriate.  *See Celotex Corp. v. Catrett*, 477 U.S.
21           317 (1986).  Second, to withstand a motion for summary judgment,
            the non-moving party must show that there are "genuine factual
22           issues that properly can be resolved only by a finder of fact
            because they may reasonably be resolved in favor of either party."
23           *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) (emphasis

24 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

25      [1] On August 20, 2004, the court informed plaintiff of the requirements for opposing a
   motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154
26 F.3d 952, 957 (9th Cir. 1998) (en banc),  *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v.*
   *Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

1
2
3
4

> added).  Finally, if the factual context makes the non-moving
> party's claim implausible, that party must come forward with more
> persuasive evidence than would otherwise be necessary to show
> that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp.*, 475 U.S. 574 (1986).  No longer can it be
> argued that *any disagreement* about a material issue of fact
> precludes the use of summary judgment.

*California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert.*

*denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added).  In short, there is no

"genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  *Grimes v. City and Country of San Francisco*, 951 F.2d 236,

239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).  There can be no genuine issue as to any

material fact where there is a complete failure of proof as to an essential element of the

nonmoving party's case because all other facts are thereby rendered immaterial.  *Celotex,* 477

U.S. at 323.

With these standards in mind, it is important to note that plaintiff bears the burden of

proof at trial over the issue raised on this motion, i.e., whether the defendant acted with

deliberate indifference to the plaintiff's safety.  Equally important is that, as explained below,

"deliberate indifference" is an essential element of plaintiff's cause of action.  Therefore, to

withstand defendant's motion, plaintiff may not rest on the mere allegations or denials of his

pleadings.  He must demonstrate a genuine issue for trial.  *Valandingham v. Bojorquez*, 866 F.2d

1135, 1142 (9th Cir. 1989).  He must rely on evidence based upon which a fair-minded jury

"could return a verdict for [him] on the evidence presented."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. at 248, 252.

"As to materiality, the substantive law will identify which facts are material.  Only

disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment."  *Id.* at 248.  Here, plaintiff's action arises

under 42 U.S.C. Section 1983 and the Eighth Amendment.  To prevail at trial, he must prove that

1  the defendant deprived him of his Eighth Amendment rights while acting under color of state

2  law.  Plaintiff has the initial burden of showing by a preponderance of competent evidence that

3  the defendants knew plaintiff faced a risk of harm that "is not one that today's society chooses to

4  tolerate," and that the defendant failed to take reasonable measures to avert that risk.  *See*

5  *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).  But defendants have the burden of proving

6  that they were unaware of the risk, or if they knew of it, that they responded reasonably even if

7  the harm nevertheless occurred.  *Farmer*, 511 U.S. at 844.  As discussed below, the evidence

8  before the court fails to demonstrate a genuine dispute about whether defendants were

9  deliberately indifferent to the report that a group of inmates was planning an attack.

10  **III.     The Applicable Eighth Amendment Standard**

11           As noted above, plaintiff claims that Correctional Officer P. Zills and Correctional

12  Sergeant M. Jimenez violated his Eighth Amendment rights by failing to call the yard down

13  based on a prisoner's report that an attack by white prisoners on black prisoners was imminent.

14  Liberally construed, plaintiff's complaint claims that defendants were deliberately indifferent to

15  his safety.  Defendants argue that there is no evidence that they acted sadistically and

16  maliciously for the very purposed of causing harm; rather, they acted in good faith.

17           Defendants' argument raises a threshold issue of which standard, "sadistic and

18  malicious" or "deliberate indifference," applies.  Defendants argue the former applies because

19  the situation in this case required them "to act urgently to restore order during a prison

20  disturbance."  Defs.' Mot. at 6.  Courts do consider whether prison officials acted sadistically

21  and maliciously for the very purpose of causing harm when prison officials use force to quell a

22  disturbance or to control a prisoner.  *Whitley v. Albers*, 475 U.S. 312 , 321-22 (1986).  However,

23  the United States Supreme Court specifically has stated that, "*Whitley* does not apply to prison

24  conditions cases," and that "the protection [a prisoner] is afforded against other inmates," is a

25  condition of confinement similar to the medical care he receives, the food he eats and the

26  temperature in his cell.  *Wilson v. Seiter*, 501 U.S., 303 (1991).  The deliberate indifference

1    standard applies in such cases.  *Farmer v. Brennan*, 511 U.S. 825, 847 (1994);  *Whitley*, 501 U.S.

2    at 302-03.  That is the applicable standard here.  Plaintiff nowhere alleges that defendants used

3    excessive force once the riot began.  All his factual allegations relate to what defendants did in

4    the few minutes *before* violence erupted.  Therefore, the court analyzes this case under the

5    deliberate indifference standard.

6    **IV.   Analysis**

7            The Eighth Amendment requires that the conditions of a prisoner's confinement, even if

8    harsh, have some legitimate penological purpose.  *See Hudson v. Palmer*, 468 U.S. 517, 584

9    (1984); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  It is important to bear in mind that,

10   "having incarcerated persons with demonstrated proclivities for antisocial criminal, and often

11   violent, conduct," and "having stripped them of virtually every means of self-protection and

12   foreclosed their access to outside aid, the government and its officials are not free to let the state

13   of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  Simply stated, the

14   Eighth Amendment's prohibition on cruel and unusual punishments imposes on prison officials

15   "a duty to protect prisoners from violence at the hands of other prisoners."  *Id.* at 833.  Prison

16   officials violate the prohibition on cruel and unusual punishments if they are deliberately

17   indifferent to a substantial risk of harm at the hands of other prisoners.  *Id.* at 837.  To be

18   deliberately indifferent, a prison official must know of, or infer from the circumstances, a

19   substantial risk of harm, yet fail to take reasonable actions to mitigate or eliminate that risk.  *Id.*

20          Defendants argue that ordinarily, prison officials will not call down the yard based solely

21   on the word of a single prisoner and assert, essentially, that they acted in good faith by

22   consulting with each other and with other sergeants, and by observing the prisoners on the yard.

23   Defs.' Mot. at 7:8-23.  But whether they acted in good faith is not the question.  The question is

24   whether they knew of a risk of harm that society is not willing to tolerate, but did not take

25   reasonable measures to mitigate or eliminate it.  One can act in good faith, yet unreasonably.

26   ////

1    Here, the court has no question that the officers acted in good faith in responding to the

2    information available to them.  The concern raised on this motion is whether the brief delay in

3    the ensuing few minutes in which the officers examined the yard for signs of a potential riot was

4    so unreasonable as to constitute deliberate indifference.  The undisputed facts show that a white

5    prisoner approached Zills to confess that he had a weapon and to request permission to leave the

6    yard because white prisoners were going to attack black prisoners.  The evidence shows that this

7    report was credible.  Possession of a weapon is a serious rule violation subjecting the offending

8    prisoner to risk of time in a segregated housing unit, loss of yard time and other privileges, and

9    having the infraction reported to the Board of Prison Terms for consideration when determining

10   a prisoner's suitability for parole.  *See, e.g.,* Cal. Code Regs. tit. 15, §§ 3006, 3324, 3315, 3335,

11   3341.5.  Furthermore, as defendants emphasize, prisoners "typically expect and value," their

12   yard time.  There is no evidence to suggest why, other than to avoid saving himself from injury

13   in an imminent riot, this prisoner confessed to a serious rule violation and volunteered to forego

14   his expected and valued recreational time, if not to avoid the riot.  However, the question

15   remains, whether the response to this credible report was "deliberate indifference."  Clearly, it

16   was not.

17       Upon learning of the report, Jimenez immediately began to investigate whether to take

18   down the yard.  There is no evidence to show a failure to act.  Rather, he immediately began

19   studying the yard for specific signs of an impending attack.  His doing so was productive.

20   Although he initially "did not notice any unusual groupings," he did notice a group of 15-20

21   white prisoners on the volleyball court dressed in long pants on a day when most prisoners wore

22   shorts.  Again, there is no evidence to suggest a failure to act on this additional information.

23   Rather, because of his observations and in less than three minutes of his learning of the report,

24   Officer Jimenez, at 9:33 a.m., radioed Sergeants Harnden and Gamberg to assist him.  The group

25   of 15-20 white prisoners on the volleyball court were nervously watching Officer Jimenez, and

26   he and Sergeants Harnden and Gamberg promptly concluded that they should call the yard down.

8

1    However, reaching for his radio to do so appears to have triggered the inmates watching him to

2    initiate their attack.

3          Under a simple negligence standard, reasonable minds might debate whether the brief

4    delay to look over the yard for any tell tale sign of a group poised to attack was reasonable.  It

5    certainly informed officers of the identity, location, and approximate number of inmates about to

6    launch an attack.  But this is a claim of cruel and unusual punishment under a deliberate

7    indifference standard.  Thus, while one might in hindsight second guess the decision by the

8    officers to examine the yard to look for signs of trouble, it cannot reasonably be said that the

9    brief delay here was a deliberate and indifferent failure to act.  It was the opposite.  The officers

10   took measured and prompt responses to each additional item of information they obtained.

11   Within only a few minutes they had identified the group poised to attack, determined their

12   location and approximate number, and had made the decision to order down the yard.

13   Unfortunately, the group attacked when they saw Jimenz reaching for the radio to make the

14   order.  Under the circumstances, the officers acted reasonably and a reasonable jury could not

15   rationally find that they failed to act on the report with deliberate indifference.  Therefore,

16   defendants are entitled to summary judgment.

17   **V.      Qualified Immunity**

18         Because the court concludes that the defendants are entitled to summary judgment on the

19   claim of an Eighth Amendment violation, it necessarily follows that they are entitled to qualified

20   immunity.  This defense protects "government officials . . . from liability for civil damages

21   insofar as their conduct does not violate clearly established statutory or constitutional rights of

22   which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

23   (1982).  The defense permits defendants to act on "a reasonable, but mistaken, belief about the

24   facts or about what the law requires in any given situation," thereby protecting  "all but the

25   plainly incompetent or those who knowingly violate the law."  *Saucier v. Katz*, 533 U.S. 194,

26   202 (2001).  Even if there has been a constitutional violation, an official "should prevail if the

1   right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably

2   believed that his particular conduct was lawful." *Romero v. Kitsap County*, 931 F.2d 624, 627

3   (9th Cir. 1991).

4          In deciding whether defendants are entitled to qualified immunity, the court must first

5   determine whether, taking the facts alleged in the light most favorable to plaintiff, it appears that

6   defendants' conduct violated a constitutional right. *Saucier*, 533 U.S. at 201; *Seigert v. Gilley*,

7   500 U.S. 226, 232 (1991).  If the court determines that no "constitutional right would have been

8   violated were the allegations established, there is no necessity for further inquiries concerning

9   qualified immunity." *Saucier*, 533 U.S. at 201.   Here, the inquiry ends at this step.  As

10  explained above, there is no evidence to show that the officers failed to respond, let alone failed

11  to do so with "deliberate indifference."  To the contrary, all of the evidence shows that they

12  immediately began to investigate with the utmost concern and sincerity.  In hindsight, an

13  immediate order may or may not have prevented the attack.  Even that is questionable as the

14  attack appears to have commenced as soon as the white inmates saw Officer Jimenez reach for

15  his radio.  However, these officers did not stand idle with deliberate disregard for the report they

16  were investigating.

17         Accordingly, it is hereby RECOMMENDED that defendants' June 1, 2006, motion for

18  summary judgment be granted.

19         These findings and recommendations are submitted to the United States District Judge

20  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after

21  being served with these findings and recommendations, any party may file written objections

22  with the court and serve a copy on all parties.  Such a document should be captioned "Objections

23  to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the

24  ////

25  ////

26  ////

1  specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158

2  F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

3  Dated:  February 21, 2007.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE